# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 6, 2013            Decided May 23, 2014

No. 12-1042

BNSF RAILWAY COMPANY,
PETITIONER

v.

SURFACE TRANSPORTATION BOARD AND UNITED STATES OF
AMERICA,
RESPONDENTS

ARIZONA ELECTRIC POWER COOPERATIVE, INC.,
INTERVENOR

———

Consolidated with 12-1045, 12-1046, 12-1246

———

On Petitions for Review of Final Orders of the
Surface Transportation Board

———

*Michael L. Rosenthal* argued the cause for petitioners
BNSF Railway Company and Union Pacific Railroad
Company. With him on the briefs were *Carolyn F. Corwin*,
*Henry B. Liu*, *Gayla L. Thal*, *Louise A. Rinn*, *Danielle E.
Bode*, *Samuel M. Sipe, Jr.*, *Anthony J. LaRocca*, *Linda S.
Stein*, *Richard E. Weicher*, and *Jill K. Mulligan*.

*Robert D. Rosenberg* argued the cause for petitioner Arizona Electric Power Cooperative, Inc.  With him on the briefs were *William L. Slover*, *Christopher A. Mills*, and *Daniel M. Jaffe*.

*James A. Read*, Attorney, Surface Transportation Board, argued the cause for respondents.  With him on the brief were *William J. Baer*, Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Nickolai G. Levin*, Attorneys, *Raymond A. Atkins*, General Counsel at the time the brief was filed, Surface Transportation Board, and *Craig M. Keats*, Deputy General Counsel.  *John P. Fonte*, Attorney, entered an appearance.

*Carolyn F. Corwin*, *Michael L. Rosenthal*, *Henry B. Liu*, *Gayla L. Thal*, *Louise A. Rinn*, *Danielle E. Bode*, *Samuel M. Sipe, Jr.*, *Anthony J. LaRocca*, *Linda S. Stein*, *Richard E. Weicher*, and *Jill K. Mulligan* were on the brief for intervenors BNSF Railway Company and Union Pacific Railroad Company.

*William L. Slover*, *Robert D. Rosenberg*, *Christopher A. Mills*, and *Daniel M. Jaffe* were on the brief for intervenor Arizona Electric Power Cooperative, Inc.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* KAVANAUGH.

KAVANAUGH, *Circuit Judge*:  Congress has directed an independent agency, the Surface Transportation Board, to ensure that railroads with market dominance charge

reasonable rates to shippers. To assess whether a dominant railroad's rate is reasonable, the Board employs a sophisticated methodology derived from economic principles. If the Board determines that the current rate is not reasonable, the Board sets the maximum rate that the railroad may charge. In setting the maximum rate in such cases, the Board relies on a formula that ensures that the railroad can still receive a reasonable rate of return.

In this case, the Board addressed a rate dispute between a shipper and two railroads. In cross-petitions coming from their contrary perspectives, the shipper and the railroads separately challenge the Board's decision. The railroads contend that the Board's decision was too favorable to the shipper. The shipper contends that the Board's decision was too favorable to the railroads. We deny the petitions for review.

I

The Surface Transportation Board, an independent federal agency, regulates the rates charged by interstate railroads. *See* 49 U.S.C. § 10501. Under federal law, a shipper may file a complaint with the Board challenging as unreasonable the rate that is "charged or collected" by a railroad for "transportation" of the shipper's goods. *Id.* § 10704(a)(1); *see id.* §§ 10704(b), 11701(b).

After receiving a complaint, the Board first determines whether it has authority over the challenged rate.

As relevant here, the Board has authority to review a railroad's rate only if the complaining shipper is "captive" to the railroad. *See id.* §§ 10701(d)(1), 10707(b)-(c). A shipper is captive if a railroad has "market dominance" over the

transportation of the shipper's freight; that is, if there is "an absence of effective competition from other rail carriers or modes of transportation for [that] transportation." *Id.* § 10707(a).

The Board has devised the Stand-Alone-Cost test to ensure that railroads charge captive shippers reasonable rates. *See Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520, 542-46 (1985), *affirmed sub nom. Consolidated Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir. 1987). That test "ensures that a captive shipper does not pay for services that provide it no benefits – in other words, that it does not cross-subsidize other shippers." *BNSF Railway Co. v. STB*, 526 F.3d 770, 776-77 (D.C. Cir. 2008). The ultimate aim of the Stand-Alone-Cost test is to require that "railroads functioning in a noncompetitive market . . . price as if alternatives to their services were available" to the captive shipper. *Coal Rate Guidelines*, 1 I.C.C.2d at 542.

To achieve that aim, the Board allows the complaining captive shipper to propose a hypothetical railroad that the shipper could use as an alternative source of transportation. *See BNSF Railway Co.*, 526 F.3d at 777. That hypothetical railroad is called a Stand-Alone Railroad and is designed to be optimally efficient. *See id.*

In order to simulate a competitive market for the captive shipper's business, the complaining shipper may construct the hypothetical Stand-Alone Railroad as if there were no barriers to entry or exit in the railroad industry. *See PPL Montana, LLC v. STB*, 437 F.3d 1240, 1242 (D.C. Cir. 2006). For example, to simulate the absence of entry barriers, the hypothetical Stand-Alone Railroad can be constructed using track that has not been laid in reality and facilities that do not

exist in reality. *See Coal Rate Guidelines*, 1 I.C.C.2d at 543. Or it could traverse a circuitous route of existing track in order to take advantage of higher density traffic on certain segments. The hypothetical Stand-Alone Railroad does not even have to be a railroad at all, if a pipeline or other alternative form of transportation would be more efficient. *See id.* & nn.60-61. The Board requires only that the complaining shipper explain and justify the elements of the hypothetical Stand-Alone Railroad. *See id.* at 543-44.

Ordinarily, the Board considers the rate that the hypothetical Stand-Alone Railroad would charge the complaining shipper in a competitive market to be the maximum rate that the actual railroad may reasonably charge. The theory is that the rate of the hypothetical Stand-Alone Railroad represents the rate that the actual railroad would charge if the industry were competitive. But under the statute, the Board may not set a maximum rate that results in revenues of less than 180 percent of the actual railroad's variable costs. *See* 49 U.S.C. § 10707(d)(1)(A). So the Board will not require that a railroad charge less than that threshold. *See Burlington Northern Railroad Co. v. STB*, 114 F.3d 206, 210 (D.C. Cir. 1997). Thus, if the rate deemed reasonable under the Stand-Alone-Cost methodology would result in actual revenues of less than 180 percent of the actual railroad's variable costs, the Board will set the maximum reasonable rate to be a rate resulting in revenues equal to 180 percent of the actual railroad's variable costs.

This case involves Arizona Electric Power Cooperative, Inc., which supplies its power plant near Cochise, Arizona, with coal brought from mines in New Mexico, Wyoming, and Montana. Two railroads transport coal from the mines to Arizona Electric's plant: Burlington Northern Santa Fe

6

Railway Company and Union Pacific Railroad Company. Depending on the origin of the coal, Burlington Northern transports it to either Deming, New Mexico, or Pueblo, Colorado. Burlington Northern contracts with a smaller, short-line railroad, Southwest Railroad, to transport the coal part of the way to Deming over track owned by Burlington Northern. From Deming and Pueblo, Union Pacific transports the coal to Arizona Electric's power plant in Arizona. Because the railroads transfer responsibility for Arizona Electric's coal at Deming and Pueblo, those two cities are known as the "interchange locations" for the routes taken by that coal.

Under the statute, a route where two railroads must carry the shipment to get from origin to destination is known as a "through route." On a through route, as relevant here, the railroads typically either together charge a single "joint rate" or individually charge "proportional rates." *See, e.g.*, *Western Resources, Inc. v. STB*, 109 F.3d 782, 789 (D.C. Cir. 1997).

In 2008, Arizona Electric challenged the reasonableness of the joint rates charged by Burlington Northern and Union Pacific for transportation of Arizona Electric's coal over these through routes. To demonstrate that the rates charged were unreasonably high, Arizona Electric submitted into evidence a proposed hypothetical Stand-Alone Railroad. Arizona Electric's proposed hypothetical Stand-Alone Railroad did not use Deming and Pueblo as its interchange locations. The Board accepted Arizona Electric's hypothetical Stand-Alone Railroad.

Relying on that hypothetical Stand-Alone Railroad, the Board concluded that the railroads' joint rates were unreasonable. The Board then prescribed the maximum rates

that the railroads could charge for the service provided to Arizona Electric. Those rates ordinarily would be equivalent to the rates charged by the hypothetical Stand-Alone Railroad. But the Board concluded that the hypothetical Stand-Alone Railroad's rates would result in revenue that is less than 180 percent of Burlington Northern and Union Pacific's actual variable costs in providing service to Arizona Electric, which is the statutory floor in these circumstances. *See* 49 U.S.C. § 10707(d)(1)(A). The Board therefore prescribed maximum rates that would provide revenue equal to 180 percent of the railroads' variable costs.

In this Court, the railroads argue that their prior rates were not unreasonable. For its part, Arizona Electric argues that the Board correctly determined that the railroads' prior rates were unreasonably high, but it contends that the Board's remedy was flawed because the Board prescribed rates that were still too high.

This Court reviews the Board's authoritative statutory interpretations under the *Chevron* framework. *See Village of Barrington v. STB*, 636 F.3d 650, 658-60 (D.C. Cir. 2011). We must uphold the Board's interpretation if it is dictated by statute or is a reasonable interpretation of an ambiguity or gap in the statute. To review the Board's exercise of its statutory discretion, the Court applies the Administrative Procedure Act's arbitrary and capricious standard of review. *See* 5 U.S.C. § 706(2)(A); *Manufacturers Railway Co. v. STB*, 676 F.3d 1094, 1096 (D.C. Cir. 2012). "[T]he APA requires that an agency's exercise of its statutory authority be reasonable and reasonably explained." *Manufacturers Railway Co.*, 676 F.3d at 1096.

8

II

We first address the railroads' argument that their prior rates were reasonable and that the Board erred in concluding otherwise.

The Board's unreasonableness determination was based on a hypothetical Stand-Alone Railroad that used interchange locations different from those actually used by the railroads when they haul Arizona Electric's coal. The railroads argue that the hypothetical Stand-Alone Railroad should have used the railroads' *actual* interchange locations. The railroads contend that the Board would have found the existing rates reasonable if the Board used a hypothetical Stand-Alone Railroad with the railroads' actual interchange locations.

In considering the railroads' argument, we start with the statutory text. In determining the reasonableness of a rate, the Board assesses the rate actually "charged or collected" by the railroad. 49 U.S.C. § 10704(a)(1). Section 10701(d)(2) of Title 49 in turn outlines three broad factors that the Board should consider when assessing the reasonableness of the rate:

> (A) the amount of traffic which is transported at revenues which do not contribute to going concern value and the efforts made to minimize such traffic;

> (B) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and

> (C) the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues.

9

*Id.* § 10701(d)(2). Under the statute, the Board is not limited to those three factors when determining the reasonableness of a rate.

To help account for those three broad reasonableness factors and to determine reasonableness, the Board has used a Stand-Alone-Cost test that employs a hypothetical Stand-Alone Railroad that is optimally efficient. The rate that the hypothetical Stand-Alone Railroad would charge is generally considered the maximum reasonable rate because it represents what the actual railroad would charge if the railroad industry were competitive. *See Coal Rate Guidelines, Nationwide*, 1 I.C.C.2d 520, 542 (1985), *affirmed sub nom. Consolidated Rail Corp. v. United States*, 812 F.2d 1444 (3d Cir. 1987).

The statute does not dictate how the hypothetical Stand-Alone Railroad may be constructed. Importantly, under longstanding Board rules and precedent, the hypothetical Stand-Alone Railroad need not follow the same route used by the actual railroad. *See id.* at 542-46 & nn.60-61. Indeed, in practice, the hypothetical railroad almost never reproduces the operations of the existing real-world carrier. Rather, it typically operates over hypothetical routes.

The one wrinkle here, according to the railroads, is that this case involves "through routes." Those are routes where two or more railroads are needed to move the traffic from the origin to the ultimate destination. The traffic goes "through" an interchange location where the two railroads connect. *See* 49 U.S.C. § 10703. Often, and as is true in this case, the railroads will charge a single "joint rate" to the shipper for a through route.

In a case like this that involves a "through route," the railroads argue that the hypothetical Stand-Alone Railroad

must use the actual interchange locations used by the actual railroads, even when the railroads charge and collect a single joint rate from the shipper.  In other words, the railroads want to make the hypothetical Stand-Alone Railroad less hypothetical.  But Congress did not unambiguously mandate that the reasonableness inquiry for through routes focus on the reasonableness of the rates for the constituent segments rather than the reasonableness of the rates for the route as a whole. *See Western Resources, Inc. v. STB*, 109 F.3d 782, 789 (D.C. Cir. 1997) ("Shippers[,] . . . if charged either a joint or proportional rate, must challenge the rate for the *entire* through movement; they cannot challenge individual segments.").   Nor has Congress mandated that the hypothetical Stand-Alone Railroad in a through route case use the same interchange locations as the actual railroads.  As the Board reasonably explained in this case, the hypothetical Stand-Alone Railroad in a through route case is logically and legally no different from the hypothetical Stand-Alone Railroad in an ordinary single-railroad case.  In neither situation, the Board reasoned, must the hypothetical Stand-Alone Railroad use the same route that is used by the actual railroads.

The railroads point to Section 10703 of Title 49, which states, as relevant here, that railroads "shall establish through routes (including physical connections) with each other."  49 U.S.C. § 10703.  The railroads focus on the phrase "including physical connections."  That phrase requires railroads to establish physical connections with one another on through routes.  But the Board could reasonably conclude that Section 10703 does not tell the Board how to assess the reasonableness of a rate on a through route.  And the Board likewise could reasonably conclude that Section 10703 does

not say how the hypothetical Stand-Alone Railroad should be constructed in a through route case.[1]

Contrary to the railroads' argument, moreover, the statute does not distinguish joint rates from other rates for purposes of the Board's reasonableness determination. On the contrary, as the Board explained in its decision here, the relevant legislative history states that "the rate standard for the reasonableness of joint rates shall be the same as for all rates." H.R. REP. NO. 96-1430, at 90 (1980) (Conf. Rep.), *reprinted in* 1980 U.S.C.C.A.N. 4110, 4121. That history supports the Board's conclusion that the hypothetical Stand-Alone Railroad in joint rate cases, like the hypothetical Stand-

---

[1] The railroads argue that regardless of the merit of their Section 10703 point, the Board failed to respond to it. We disagree. The Board explained that the statutory scheme treats interchange locations no differently from other features of railroad "transportation." *See* 49 U.S.C. § 10102(9) (defining "transportation" as including the facilities and equipment of a railroad); *id.* § 10704(a)(1) (allowing shippers to challenge the reasonableness of rates "charged or collected by a rail carrier for transportation"). Under the Board's interpretation, the interchange locations of the actual railroads do not constrain the flexibility shippers generally enjoy when designing the hypothetical Stand-Alone Railroad any more than do the facilities or equipment of the actual railroads. In the course of rejecting the railroads' arguments on interchange locations, the Board thus at least implicitly rejected the railroads' Section 10703 point. We grant significant deference to the Board's determinations of the reasonableness of a rate, and we can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) (internal quotation marks omitted). We conclude that the Board adequately addressed the railroads' Section 10703 point.

Alone Railroad in single-railroad cases, need not follow the actual route used by the railroads.

The necessary implication of the railroads' argument is that a joint rate (for a route from A to C) must be divided into two rates (between A and B and between B and C), each of which must be assessed for reasonableness. Congress has not said as much. And that argument overlooks the unity of joint rates, a principle that the Board and the courts have long recognized. *See generally Great Northern Railway Co. v. Sullivan*, 294 U.S. 458 (1935). As the Board stated here, "for practical purposes, when carriers elect to offer a through rate, they are treated as a single legal entity." *Arizona Electric Power Cooperative, Inc. v. BNSF Railway Co.*, 2011 WL 5872084, at *12 (STB served Nov. 22, 2011). So the Board concluded that "the reasonableness of the joint rates charged and collected is in this case properly being judged against a simulated competitive price of a single hypothetical" Stand-Alone Railroad. *Id.* at *14 (emphasis omitted) (internal quotation marks omitted).

In short, the railroads concede that the hypothetical Stand-Alone Railroad ordinarily may travel any route between the freight's origin and destination. The railroads offer no persuasive reason why the same principle should not govern when the Board evaluates a unitary joint rate charged by multiple railroads on a through route.

We conclude that the Board's interpretation and application of the statute on this issue were at least reasonable, and also were reasonably explained.

13

III

From the other direction, Arizona Electric argues that the Board correctly determined that the railroads' prior rates were unreasonably high, but that the Board's remedy did not suffice because the Board prescribed maximum rates that were still too high.

Recall that the Board may not set a maximum rate that results in revenues of less than 180 percent of the actual railroads' variable costs, as required by statute. *See* 49 U.S.C. § 10707(d)(1)(A). (The railroads' variable costs are the costs that vary depending on the volume of traffic, such as the cost of fuel.) The dispute here turns on what those variable costs were for the railroads.

Pursuant to statute, the Board calculates variable costs using a methodology called the Uniform Rail Costing System. *See id.* § 10707(d)(1)(B); *BNSF Railway Co. v. STB*, 526 F.3d 770, 774-75 (D.C. Cir. 2008). The system receives numerous inputs about the characteristics of the transportation at issue and computes the variable cost for that transportation based on average costs associated with each characteristic. *See BNSF Railway Co.*, 526 F.3d at 774-75.

Burlington Northern leases a portion of its line to Southwest Railroad. Pursuant to the lease, Southwest Railroad carries Arizona Electric's coal over a short distance. When calculating the variable costs of that portion of the route, the Board inputted Southwest Railroad as the relevant railroad. Arizona Electric argues that the Board instead should have inputted Burlington Northern and, had it done so, would have found lower variable costs for the railroads and thus would have further reduced the maximum rates that the railroads could charge Arizona Electric.

When inputting Southwest Railroad, the Board relied on its prior decision in *Kansas City Power & Light Co. v. Union Pacific Railroad Co.*, 2008 WL 2091413 (STB served May 19, 2008). In *Kansas City Power*, the Board decided that when one railroad moves a shipper's freight over lines leased from another railroad, the railroad that actually moves the shipper's freight must be inputted as the relevant railroad for purposes of the Uniform Rail Costing System. *See id.* at *5-6. As the Board explained in its decision in this case, the *Kansas City Power* rule ensures that the Uniform Rail Costing System output reflects reality: that even when a shipment occurs over lines owned exclusively by one railroad, there may be costs associated with moving the shipper's freight between railroads operating on those lines. Basing the cost determination on an assumption that only one railroad was moving the freight would in some cases inaccurately reflect the railroad's actual costs. Here, Southwest Railroad actually moved Arizona Electric's freight over the relevant portion of the route. Following *Kansas City Power*, the Board thus inputted Southwest Railroad into the Uniform Rail Costing System to reflect the real-world operation of the railroads carrying Arizona Electric's coal.

Put simply, Arizona Electric has not demonstrated that the Board's reasoning in *Kansas City Power* is unreasonable or contrary to statute, or that the Board unreasonably applied *Kansas City Power* to the facts here. We conclude that the Board's calculation of the railroads' variable costs was reasonable and reasonably explained.

## IV

After the Board's decision, the railroads switched from joint to proportional rates. In response to a complaint from

Arizona Electric that the switch would lead to over-charging, the Board denied relief. *See Arizona Electric Power Cooperative, Inc. v. BNSF Railway Co.*, 2012 WL 1864787 (STB served May 22, 2012). The Board allowed the proportional rates. *See id.* But importantly, the Board made clear that the combined proportional rates may not exceed the maximum rates prescribed by the Board. *See id.* at *2-3. For that reason, we detect no current injury to Arizona Electric from the Board's decision on this point. Arizona Electric therefore lacks standing to raise this issue at this time.

\* \* \*

We have carefully considered all of the parties' arguments. We deny the petitions for review.

*So ordered.*