# United States Court of Appeals

## For the Eighth Circuit

_____

No. 22-3648

_____

Union Pacific Railroad Co.

*Petitioner*

v.

Surface Transportation Board; United States of America

*Respondent*s

American Chemistry Council; Corn Refiners Association; National Grain and Feed Association; National Industrial Transportation League; The Fertilizer Institute

*Intervenor*s

------------------------------

Washington Legal Foundation

*Amicus on Behalf of Petitioner*

_____

No. 23-1325

_____

Association of American Railroads

*Petitioner*

v.

Surface Transportation Board; United States of America

*Respondent*s

------------------------------

Washington Legal Foundation

*Amicus on Behalf of Petitioner*
_____

Petition for Review of an Order of the
Surface Transportation Board
_____

Submitted: December 13, 2023
Filed: August 20, 2024
_____

Before SMITH, Chief Judge,[1] GRUENDER and GRASZ, Circuit Judges.
_____

SMITH, Chief Judge.

Congress has charged the Surface Transportation Board (Board) with resolving rate disputes between rail carriers and shippers when rates are not set by private contract. *See* 49 U.S.C. §§ 10704(a)(1), 10709(c)(1). In the Surface Transportation Board Reauthorization Act of 2015, Congress directed the Board to "maintain 1 or more simplified and expedited methods for determining the reasonableness of challenged [rail carrier] rates in those cases in which a full stand-alone cost

_____

[1]Judge Smith completed his term as chief judge of the circuit on March 10, 2024. *See* 28 U.S.C. § 45(a)(3)(A).

presentation is too costly, given the value of the case." 49 U.S.C. § 10701(d)(3). These petitions for review challenge the Board's adoption of a final rule to establish a new procedure for challenging the reasonableness of rail carrier rates in smaller cases, the Final Offer Rate Review (FORR). Under FORR, the Board decides a case by selecting either the shipper's or the rail carrier's final offer. Union Pacific Railroad Company and the Association of American Railroads (collectively, "petitioners") challenge FORR on three grounds: (1) the Board lacks statutory authority to implement this procedure; (2) FORR is unconstitutionally vague because parties lack fair notice of the methodology the Board will use to decide cases; and (3) FORR is arbitrary and capricious. For the reasons stated below, we grant the petitions for review.

## I. *Background*
### A. *Statutory Overview*

The Board resolves rate disputes between rail carriers and shippers when rates are not set by private contract. *See* 49 U.S.C. §§ 10704(a)(1), 10709(c)(1). "The Board may begin a proceeding . . . only on complaint." *Id.* § 10704(b). In deciding a rate dispute, the Board must first find that "a rail carrier has market dominance over the transportation to which a particular rate applies." *Id.* § 10701(d)(1); *see also id.* § 10707(b)–(c). A "rail carrier . . . does not have market dominance . . . if . . . the rate charged results in a revenue-variable cost percentage for such transportation that is less than 180 percent." *Id.* § 10707(d)(1)(A).

If the rail carrier has market dominance, then the Board must next determine whether "the rate established by such carrier for such transportation [is] reasonable." *Id.* § 10701(d)(1); *see also id.* § 10707(c) ("When the Board finds in any proceeding that a rail carrier proposing or defending a rate for transportation has market dominance over the transportation to which the rate applies, it may then determine that rate to be unreasonable if it exceeds a reasonable maximum for that

-3-

transportation."). The Board must hold a "full hearing" before determining a rate's reasonableness. *Id.* § 10704(a)(1). The Board must determine the rate that the rail carrier actually "charged or collected." *Id.* It is required to "give due consideration to," *id.* § 10701(d)(2), the three Long-Cannon[2] factors in assessing a rate's reasonableness. These factors are:

> (A) the amount of traffic which is transported at revenues which do not contribute to going concern value and the efforts made to minimize such traffic;
>
> (B) the amount of traffic which contributes only marginally to fixed costs and the extent to which, if any, rates on such traffic can be changed to maximize the revenues from such traffic; and
>
> (C) the carrier's mix of rail traffic to determine whether one commodity is paying an unreasonable share of the carrier's overall revenues,
>
> recognizing the policy of this part that rail carriers shall earn adequate revenues, as established by the Board under section 10704(a)(2) of this title.

*Id.* § 10701(d)(2)(A)–(C).

Finally, if the Board finds that the rail carrier's rate is unreasonable, "the Board may prescribe the maximum rate, classification, rule, or practice to be followed. The Board may order the carrier to stop the violation." *Id.* § 10704(a)(1). In setting that rate, the Board must

---

[2]*See Potomac Elec. Power Co. v. ICC*, 744 F.2d 185, 188 (D.C. Cir. 1984) (explaining that, in passing the Long-Cannon Amendment, Congress required the Commission to consider these three factors).

maintain and revise as necessary standards and procedures for establishing revenue levels for rail carriers providing transportation subject to its jurisdiction under this part that are adequate, under honest, economical, and efficient management, for the infrastructure and investment needed to meet the present and future demand for rail services and to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business. The Board shall make an adequate and continuing effort to assist those carriers in attaining revenue levels prescribed under this paragraph. Revenue levels established under this paragraph should—

> (A) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation; and

> (B) attract and retain capital in amounts adequate to provide a sound transportation system in the United States.

*Id.* § 10704(a)(2)(A)–(B).

B. *Methodologies for Determining a Rate's Reasonableness*

In determining a rate's reasonableness, "almost all rate cases have proceeded under the Stand-Alone Cost test, sometimes referred to as the 'SAC test.'" *CSX Transp., Inc. v. Surface Transp. Bd.*, 754 F.3d 1056, 1059 (D.C. Cir. 2014). This test requires the "complainants [to] design a hypothetical stand-alone railroad, sometimes referred to as an 'SARR,' which is 'a fully efficient hypothetical competitor railroad that serves the complaining shipper and other traffic sharing common facilities.'" *Id.* at 1059–60 (quoting *CSX Transp., Inc. v. Surface Transp. Bd.*, 568 F.3d 236, 238 (D.C. Cir.), *opinion vacated in part on reh'g*, 584 F.3d 1076 (D.C. Cir. 2009)). "[I]f the stand-alone railroad would generate revenues that 'exceed[] the costs (including

a reasonable profit) of running the stand-alone railroad,'" then "[t]he Board will find a challenged rate unreasonable." *Id.* at 1060 (second alteration in original) (quoting *CSX Transp.*, 568 F.3d at 238–39).

### 1. *Three-Benchmark Methodology*

"SAC tests are complicated and costly . . . ." *Id.* As a result, Congress has required the Board to "maintain 1 or more simplified and expedited methods for determining the reasonableness of challenged rates" in cases involving smaller disputes with a rail carrier. 49 U.S.C. § 10701(d)(3). In response to Congress, the Board has adopted simplified methodologies for determining reasonableness. Pertinent to this case, the Board adopted the Three-Benchmark methodology, "which determines the reasonableness of a challenged rate using three benchmark figures." Final Offer Rate Review; Expanding Access to Rate Relief, 88 Fed. Reg. 299, 300 (Jan. 4, 2023) (Final rule) (codified at 49 C.F.R. pts. 1002, 1111, 1114, and 1115) (citing Rate Guidelines—Non-Coal Procs., 1 S.T.B. 1004 (1996), *pet. to reopen denied*, 2 S.T.B. 619 (1997), *appeal dismissed sub nom. Ass'n of Am. R.Rs. v. STB*, 146 F.3d 942 (D.C. Cir. 1998)). The Board's current Three-Benchmark methodology includes a final offer procedure more commonly used "in commercial settings, including the resolution of wage disputes in Major League Baseball," to streamline the process of reaching an acceptable arrangement. *Id.* at 301.

In addition to modifying the Three-Benchmark methodology over the years, the Board has "also created another simplified methodology, known as Simplifed-SAC, which determines whether a captive shipper is being forced to cross-subsidize other parts of the railroad's network." *Id.* at 300 (citing Simplified Standards for Rail Rate Cases, EP 646 (Sub-No. 1) (STB served Sept. 5, 2007), *aff'd sub nom. CSX Transp.*, 568 F.3d 236).

## 2. *Final Offer Rate Review (FORR)*

"Notwithstanding the Board's efforts to improve its rate review methodologies and make them more accessible, only a few Three-Benchmark cases have ever been brought to the Board, and no complaint has been litigated to completion under the Simplified-SAC methodology." *Id.* at 300. As a result, the Board "adopt[ed] a final rule . . . to establish a new procedure for challenging the reasonableness of railroad rates in smaller cases." *Id.* at 299. This procedure, known as FORR, permits the Board to "decide a case by selecting either the complainant's or the defendant's final offer, subject to an expedited procedural schedule that adheres to firm deadlines." *Id.* In justifying FORR's adoption, the Board cited "[t]he benefits of final offer procedures used in other settings [to] offer support and background for [FORR]." *Id.* at 301 (citing Josh Chetwynd, *Play Ball? An Analysis of Final-Offer Arb., Its Use in Major League Baseball, & Its Potential Applicability to Eur. Football Wage & Transfer Disps.*, 20 Marq. Sports L. Rev. 109 (2009) (noting the final offer procedure "can lead to a win-win situation as it spurs negotiated settlement at a very high rate"); Michael Carrell & Richard Bales, *Considering Final Offer Arb. to Resolve Pub. Sector Impasses in Times of Concession Bargaining*, 28 Ohio St. J. on Disp. Resol. 1, 3, 16, 23–24 (2012) (noting that 14 states had codified some form of final offer arbitration for certain labor disputes involving public sector employees and noting that the procedure "encourages the parties to negotiate toward middle ground rather than staking out polar positions" and "encourages the parties to settle before arbitration")).

Under FORR, the shipper initiates the case by filing a notice of intent and serving notice on the rail carrier. *Id.* at 318; *see also* 49 C.F.R. § 1111.10(a)(3)(i)(A), (a)(3)(ii)(A). Once the complaint is filed, "discovery begins." 88 Fed. Reg. at 318; *see also* 49 C.F.R. § 1111.10(a)(3)(i)(B), (a)(3)(ii)(B). Following discovery, the shipper and rail carrier submit simultaneous reasonableness analyses and final offers, while the shipper (but not the rail carrier) submits "opening evidence on market

dominance." 88 Fed. Reg. at 318; *see also* 49 C.F.R. § 1111.10(a)(3)(i)(D), (a)(3)(ii)(D). In submitting their final offers, the parties "must submit an explanation of the methodology . . . used." 88 Fed. Reg. at 318; *see also* 49 C.F.R. § 1111.10(a)(3)(v).[3] The parties next file their simultaneous replies. In the reply, the rail carrier includes "reply evidence on market dominance." 88 Fed. Reg. at 318; *see also* 49 C.F.R. § 1111.10(a)(3)(i)(E), (a)(3)(ii)(E). As the complainant, the shipper "bear[s] the burden of proof to demonstrate that (i) the defendant carrier has market dominance over the transportation to which the rate applies, and (ii) the challenged rate is unreasonable." 88 Fed. Reg. at 302 (citing, in part, 49 U.S.C. §§ 10701(d)(1), 10704(a)(1), 11704(b)).

Following briefing, the Board renders its decision. *Id.* at 318; *see also* 49 C.F.R. §1111.10(a)(3)(i)(H), (a)(3)(ii)(F).[4] Upon finding that the shipper's "market dominance presentation and rate reasonableness analysis demonstrate that the defendant carrier has market dominance over the transportation to which the rate applies and that the challenged rate is unreasonable, the Board . . . then choose[s] between the parties' final offers." 88 Fed. Reg. at 302. In choosing between the

---

[3]"FORR does not prescribe a particular methodology . . . ." Final Offer Rate Review; Expanding Access to Rate Relief, 84 Fed. Reg. 48,872, 48,878 (Sept. 17, 2019) (Notice of proposed rulemaking; request for comments) (codified at 49 C.F.R. pts. 1002, 1111, 1114, and 1115). Instead, "the Board expects that . . . the rail transportation policy [(RTP)], the Long-Cannon factors, and appropriate economic principles . . . allow for the parties to submit final offers using their preferred methodologies, including revised versions of the Board's existing rate review methodologies or new methodologies altogether." *Id.* at 48,876.

[4]In cases in which the shipper "elects streamlined market dominance," the shipper notifies via letter "the Board whether it elects an evidentiary hearing on market dominance" and then a "[t]elephonic evidentiary hearing [is held] before an administrative law judge . . . at the discretion of the [shipper]" prior to the Board's decision. 88 Fed. Reg. at 318; *see also* 49 C.F.R. § 1111.10(a)(3)(i)(F)–(G).

parties' final offers, "[t]he Board . . . take[s] into account . . . the RTP, the Long-Cannon factors in 49 U.S.C. [§] 10701(d)(2), and appropriate economic principles." *Id.* The Board's selection of a final offer "would be an 'either/or' selection, with no modifications by the Board." 84 Fed. Reg. at 48,877. The Board "would not attempt to find a compromise position." *Id.* "If a party adopts a position that is contrary to the[] guiding criteria, it risks the likelihood that the Board would choose the other party's offer." *Id.* at 48,876. "If [the shipper] fails to submit explanation and support for its offer, the Board may dismiss the complaint without determining the reasonableness of the challenged rate." 88 Fed. Reg. at 318; *see also* 49 C.F.R. § 1111.10(a)(3)(v).

After "find[ing] that the defendant carrier has market dominance, find[ing] the challenged rate unreasonable, and choos[ing] the complainant's offer (or the defendant's offer, if it is below the challenged rate)," the Board may "award relief based on the difference between the challenged rate and the rate in that offer." 84 Fed. Reg. at 48,877.

When the Board adopted FORR as a final rule, two of the five Board members dissented. 88 Fed. Reg. at 314–17. Board Member Patrick J. Fuchs concluded that "FORR is an evasion of the Board's fundamental responsibility because it makes the Board entirely dependent on litigants' self-determined rate review methodologies, gives little meaningful guidance for those methodologies, and prohibits the Board from devising its own remedy where necessary." *Id.* at 314. In his view, "FORR reduces the agency to mere passive, all-or-nothing selections based only on litigants' methodologies and proposed remedies. In FORR, the Board does not set its own methodology that gives clear, specific meaning to the statutory criteria . . . ." *Id.*

Board Member Fuchs rejected the Board's attempt to compare FORR to the Three-Benchmark methodology's use of "a final offer process for picking comparison

groups." *Id.* He explained that "when [the Board] established Three-Benchmark, [it] exercised considerable discretion to guard the public interest and give specific meaning to statutory criteria—based on its own expertise and judgement—by, among other things, defining a formula that accounts for the level of revenue adequacy to be achieved through a rail carrier's rate-setting." *Id.* FORR, however, "offers little useful guidance, let alone a methodology, on fundamental concepts like revenue adequacy and differential pricing." *Id.* Board Member Fuchs concluded that "FORR is unique among the agency's processes in that the Board evades responsibility on both the front and back ends—neither defining methodologies in advance nor permitting the Board's own remedies in individual cases." *Id.*

Board Member Michelle A. Schultz also dissented. She expressed her "deep legal and practical concerns about FORR, which [she] believe[d] prevents the Board from engaging in reasoned decision-making, fails to properly align risk between complainants and defendants, and could depress rail rates below what is reasonable." *Id.* at 316. She opined that "FORR would require the Board to choose between two rates—even if the Board finds the correct outcome falls above, below, or somewhere in between the two submissions." *Id.* "[T]his limitation on the Board's ability to exercise its own judgment by weighing each side's arguments, evaluating the evidence, and considering both the public interest and rail transportation policy" "troubl[ed]" Board Member Schultz. *Id.* She explained that "the Board's congressionally authorized responsibility to provide regulatory oversight of rates requires more than a reliance upon two submitted proposals. It requires the Board to actually exercise its discretion and decision-making authority." *Id.* at 317.

## II. *Discussion*

These petitions for review challenge the Board's final rule adopting FORR and request vacatur of that rule. First, the petitioners argue that the Board lacks statutory authority to "prescribe railroad rates through [FORR,] a baseball arbitration scheme."

Pet'rs' Br. at 13. Second, the petitioners assert that "FORR is unconstitutionally vague" because rail carriers "do not know how the Board will determine what is 'reasonable' in any given case" considering "[t]he Board's refusal to establish a governing methodology in advance, or to provide any ascertainable standard for how it will make reasonableness determinations." *Id.* at 14. Finally, the petitioners contend that "[t]he final rule adopting FORR is arbitrary and capricious" because it "prevents the Board from engaging in reasoned decisionmaking [by] . . . prohibit[ing] the Board from choosing the correct outcome, unless one of the parties just happens to propose it." *Id.* at 15.

Our task is to determine whether Congress statutorily authorized the Board to prescribe rail carrier rates through a rate-setting scheme like FORR. "Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) (per curiam). "Congress . . . enacted the APA [(Administrative Procedure Act)] as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2261 (2024) (internal quotation marks omitted) (overruling *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). The APA sets forth judicial review of agency action. *Id.* It "directs that '[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action.'" *Id.* (quoting 5 U.S.C. § 706). Additionally, under the APA, reviewing courts must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." *Id.* (alteration in original) (quoting 5 U.S.C. § 706(2)(A)); *see also Union Pac. R.R. Co. v. Surface Transp. Bd.*, 863 F.3d 816, 822 (8th Cir. 2017) ("Agency action taken without statutory authority must be set aside."); *United States ex rel. O'Keefe v. McDonnell Douglas Corp.*, 132 F.3d 1252, 1257 (8th Cir.

1998) ("An agency's promulgation of rules without valid statutory authority implicates core notions of the separation of powers, and we are required by Congress to set these regulations aside."). The APA "makes clear that agency interpretations of statutes . . . are *not* entitled to deference." *Loper Bright Enters.*, 144 S. Ct. at 2261. It is our responsibility as the reviewing court "to decide whether the law means what the agency says." *Id.* (internal quotation marks omitted).

Thus, in determining "whether an agency has acted within its statutory authority, as the APA requires," we "must exercise [our] independent judgment." *Id.* at 2273. "When interpreting a statute, we begin with the statute's plain language, giving words the meaning that proper grammar and usage would assign them. If the intent of Congress can be clearly discerned from the statute's language, the judicial inquiry must end." *United States v. Lester*, 92 F.4th 740, 742 (8th Cir. 2024) (cleaned up). If confronted with a statutory ambiguity, we must "independently interpret the statute." *Loper*, 144 S. Ct. at 2266. In exercising our "independent judgment," we "may . . . seek aid from the interpretations of those responsible for implementing particular statutes. Such interpretations constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance consistent with the APA." *Id.* at 2262 (internal quotation marks omitted); *see also id.* at 2273 ("Careful attention to the judgment of the Executive Branch may help inform that inquiry."). We must "use every tool at [our] disposal to determine the best reading of the statute and resolve [any] ambiguity." *Id.* at 2266.

We begin with the statute's plain language. The Board claims that 49 U.S.C. § 10704(a)(1) provides the statutory authority to prescribe rail carrier rates through FORR. Section 10704(a)(1) provides:

> When the Board, *after a full hearing*, decides that a rate charged or collected by a rail carrier for transportation subject to the jurisdiction of the Board under this part, or that a classification, rule, or practice of that

carrier, does or will violate [Part A, Subtitle IV of Title 49], *the Board may prescribe the maximum rate*, classification, rule, or practice to be followed.

(Emphases added.) In turn, Part A provides that "[i]f the Board determines, under [49 U.S.C. §] 10707[5] . . . , that a rail carrier has market dominance over the transportation to which a particular rate applies, the rate established by such carrier for such transportation must be reasonable." *Id.* § 10701(d)(1); *see also BNSF Ry. Co. v. Surface Transp. Bd.*, 526 F.3d 770, 773 (D.C. Cir. 2008) (Kavanaugh, J.) ("After the Board determines that it has jurisdiction over a challenged rate, the Board must decide whether the rate is reasonable." (citing 49 U.S.C. § 10701(d)(1)). Congress requires the Board to "maintain 1 or more simplified and expedited methods for determining the reasonableness of challenged rates" in cases involving smaller disputes with a rail carrier. 49 U.S.C. § 10701(d)(3). The Board determines whether the challenged rate is reasonable by "giv[ing] *due consideration* to" the Long-Cannon factors, "recognizing the policy of [Part A, Subtitle IV of Title 49] that rail carriers shall earn adequate revenues, as established by the Board under section 10704(a)(2) of [Title 49]." *Id.* § 10701(d)(2)(A)–(C); *see also id.* § 10704(a)(2).[6] "If the Board

_____

[5]Section 10707(c) provides:

When the Board finds in any proceeding that a rail carrier proposing or defending a rate for transportation has market dominance over the transportation to which the rate applies, it may then determine that rate to be unreasonable if it exceeds a reasonable maximum for that transportation. However, a finding of market dominance does not establish a presumption that the proposed rate exceeds a reasonable maximum.

[6]Section 10704(a)(2) provides, in relevant part:

Revenue levels established under this paragraph should—

-13-

finds the rate *unreasonable*, it sets the maximum rate the railroad may charge. In setting that rate, the Board must permit the railroad to cover its costs 'plus a reasonable and economic profit or return (or both) on capital employed in the business.'" *BNSF Ry. Co.*, 526 F.3d at 773 (emphasis added) (first citing 49 U.S.C. § 10704(a)(1), then quoting 49 U.S.C. § 10704(a)(2)).

Is FORR consistent with the Board's statutory obligations? We hold that it is not because some of FORR's requirements conflict with the Board's statutory duties. Section 10704(a)(1) requires the Board to hold a "full hearing" before determining a rate's reasonableness. The threshold question we must answer is whether this "full hearing" is an adjudication to which the APA applies; if so, then certain procedural protections apply. "The APA itself mandates that its provisions govern certain administrative proceedings." *Portland Audubon Soc. v. Endangered Species Comm.*, 984 F.2d 1534, 1540 (9th Cir. 1993) (citing *Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1261–64 (9th Cir. 1977); *City of W. Chic. v. U.S. Nuclear Regul. Comm'n*, 701 F.2d 632, 641 (7th Cir. 1983) (collecting cases)). Section 554 of the APA "pertains to formal adjudications"; it "applies to 'every case of adjudication required by statute to be determined on the record after [the] opportunity for an agency hearing.'" *Id.* (alteration in original) (quoting 5 U.S.C. § 554(a); *Girard v. Klopfenstein*, 930 F.2d 738, 741 (9th Cir. 1991)). Section 554(a) further "provides that any hearing conducted and any decision made in connection with such an adjudication shall be 'in accordance with sections 556 and 557 of this title.'" *Id.* (quoting 5 U.S.C.

---

(A) provide a flow of net income plus depreciation adequate to support prudent capital outlays, assure the repayment of a reasonable level of debt, permit the raising of needed equity capital, and cover the effects of inflation; and

(B) attract and retain capital in amounts adequate to provide a sound transportation system in the United States.

-14-

§ 554(c)(2)). "In other words, by virtue of the terms of APA § 554, sections 556 and 557 are applicable whenever that section applies." *Id.* Thus, all of these sections apply "whenever the three requirements set forth in APA § 554(a) are satisfied: The administrative proceeding must be 1) an adjudication; 2) determined on the record; and 3) after the opportunity for an agency hearing." *Id.*; *see also Marathon Oil*, 564 F.2d at 1262 ("[S]ections 554, 556, and 557 of the APA . . apply to adjudications 'required by statute to be determined on the record after opportunity for an agency hearing.'" (quoting 5 U.S.C. § 554(a)). We will now examine whether these requirements are satisfied in the present case.

"The APA defines 'adjudication' broadly as an agency process leading to a final disposition 'other than rulemaking.'" *Marathon Oil*, 564 F.2d at 1263 (quoting 5 U.S.C. § 551(6)–(7)). "In setting out procedures that an agency must follow in making 'adjudicatory' determinations, Congress recognized that certain administrative decisions closely resemble judicial determinations and, in the interest of fairness, require similar procedural protections." *Id.* at 1261. "Where an agency's task is 'to adjudicate disputed facts in particular cases,' an administrative determination is quasi-judicial.'" *Portland Audubon Soc.*, 984 F.2d at 1540 (quoting *Marathon Oil*, 564 F.2d at 1262). As in "judicial proceedings, the ultimate decision often turns, in large part, on sharply-disputed factual issues. As a result, . . . APA procedures . . . are needed both for the protection of affected parties and to help achieve reasoned decisionmaking." *Marathon Oil*, 564 F.2d at 1261.

"At the opposite end of the pole are agency determinations that depend less on the resolution of factual disputes and more on the drawing of policy; such 'rulemaking' decisions must by necessity be guided by more informal procedures." *Id.* (footnote omitted). "[R]ulemaking concerns policy judgments to be applied generally in cases that may arise in the future . . . ." *Portland Audubon Soc.*, 984 F.2d at 1540. The APA's procedural protections are not necessary in proceedings

conducted "for the purpose of promulgating policy-type rules or standards." *Marathon Oil*, 564 F.2d at 1262 (internal quotation marks omitted).[7]

"We conclude that the first requirement of APA § 554(a) is satisfied." *Portland Audubon Soc.*, 984 F.2d at 1540. The Board is tasked with resolving rate disputes between rail carriers and shippers. *See* 49 U.S.C. §§ 10704(a)(1), 10709(c)(1). In determining whether "the rate established by such carrier for such transportation [is] reasonable," *id.* § 10701(d)(1), the Board is statutorily required to hold a "full hearing," *id.* § 10704(a)(1). In assessing a rate's reasonableness, the Board is also statutorily required to "give due consideration to," *id.* § 10701(d)(2), the three Long-Cannon factors. Assessing the reasonableness of a rail carrier's rate requires the Board "to weigh the many factors at issue." *BNSF Ry. Co.*, 526 F.3d at 774. In other words, the Board must weigh the statutory factors to resolve the parties' factual dispute over the reasonableness of the challenged rate. *Cf. Portland Audubon Soc.*, 984 F.2d at 1540 ("Under the Endangered Species Act the Committee decides whether to grant or deny specific requests for exemptions based upon specific factual showings.").

As to the second § 554(a) requirement, "[a]lthough Section 554 specifies that the governing statute must satisfy the 'on the record' requirement, those three magic words need not appear for a court to determine that formal hearings are required." *Lane v. USDA*, 120 F.3d 106, 108–09 (8th Cir. 1997) (quoting *City of W. Chic.*, 701 F.2d at 641). For the APA's "formal, on-the-record hearing provisions" to apply, "Congress need only 'clearly indicate its intent to trigger'" them. *Id.* (quoting *City of W. Chic.*, 701 F.2d at 641). Application of the procedural safeguards "rests on the

---

[7]Also "exclude[d] from the residual definition of adjudication [are] governmental functions, such as the administration of loan programs, which traditionally have never been regarded as adjudicative in nature and as a rule have never been exercised through other than business procedures." *Id.* at 1263 (internal quotation marks omitted).

substantive character of the proceedings involved," "[a]bsent congressional intent to the contrary." *Marathon Oil*, 564 F.2d at 1263. "In summary, the crucial question is not whether particular talismanic language was used but whether the proceedings under review fall within that category of quasi-judicial proceedings deserving of special procedural protections." *Id.* at 1264. A court's inquiry must be focused "on the nature of the administrative determination before [it]." *Id.*

We conclude that the second requirement of APA § 554(a) is satisfied. Although § 10704(a)(1) does not contain the "three magic words" of "on the record," those words are not needed for us to determine that the APA's procedural protections apply. *Lane*, 120 F.3d at 108. Section 10704(a)(1) does require the Board to hold a "full hearing." When adjudicating the rate dispute between the shipper and rail carrier, the Board is not engaging in rulemaking but instead is engaging in "an agency process leading to a final disposition" of the parties' rate dispute. *Marathon Oil*, 564 F.2d at 1263.

As to the third § 554(a) requirement, "[w]herever the outer bounds of the 'after opportunity for an agency hearing' requirement may lie, . . . where . . . a statute provides that an adjudication be determined at least in part *based on* an agency hearing, that requirement is fulfilled.'" *Portland Audubon Soc.*, 984 F.2d at 1541. "The failure of Congress to provide for any hearing whatsoever within an administrative process may well be a valid indication that Congress either did not feel that it was providing for an 'adjudication' in the traditional sense of the word or did not intend the APA procedures to apply." *Marathon Oil*, 564 F.2d at 1263. But when "a statute provides for a hearing, similar weight should not typically be accorded to Congress'[s] failure to specify that determinations must be made 'on the record.'" *Id.* We conclude that this third requirement is satisfied. Under § 10704(a)(1), the Board is statutorily authorized to "prescribe the maximum rate" "after a full hearing" on the rate's reasonableness. *Cf. Portland Audubon Soc.*, 984 F.2d at 1541 (concluding third

requirement was satisfied because the Endangered Species Act "requires that the [agency's] final decision be '*based on* the report of the Secretary, [the record of] *the hearing* held under (g)(4) of this section . . . and on such other testimony or evidence as it may receive'" (quoting 16 U.S.C. § 1536(h)(1)(A))).

Having determined that the requirements set forth in § 554(a) are satisfied, we must examine whether FORR complies with the APA's procedural requirements. *See Marathon Oil*, 564 F.2d at 1262 (if proceeding is adjudicatory in nature, it requires the special protections of APA sections 554, 556, and 557). We focus on the APA's requirement that, "[e]xcept as otherwise provided by statute, the proponent of a rule or order has the burden of proof." 5 U.S.C. § 556(d).[8] The APA does not define

_____

[8]In its notice of proposed rule making, the Board recognized the APA as the source of its allocation of the burden of proof to the shipper to prove market dominance and unreasonableness. 84 Fed. Reg. at 48,877 (citing 5 U.S.C. § 556(d)). In the final rule, however, the Board rejected § 556(d) "as the source of burden allocation." 88 Fed. Reg. at 306. The Board acknowledged that it had previously "relied on section 556(d) as the source of burden allocation in Board adjudications." *Id.* It further recognized that, in those cases, the Board "correctly assigned the burden of proof to parties seeking relief, based on Board precedent establishing such a burden allocation." *Id.* The Board concluded that this "precedent will continue to apply as a general matter in Board proceedings." *Id.* But, "[o]n further reflection, . . . the Board conclude[d] that some of its previous decisions incorrectly identified section 556(d)—rather than Board precedent itself—as the source of that burden allocation." *Id.* The Board determined that § 556(d) applies only "to formal 'trial-type' hearings, which do not include the Board's rate reasonableness proceedings." *Id.* (citing Final Offer Rate Review; Expanding Access to Rate Relief, 2021 WL 5327977, at *16 (Nov. 12, 2021) (Supplemental notice of proposed rulemaking) (codified at 49 C.F.R. pts. 1002, 1111, 1114, and 1115); *R.R. Comm'n of Tex. v. United States*, 765 F.2d 221, 227 (D.C. Cir. 1985) (stating formal adjudication procedures will "obtain only on the requirement of a 'hearing on the record'")). The Board further concluded that "precedent clearly establishes that the burden allocation language of section 556(d), in particular, does not apply outside formal 'trial-type'

"burden of proof"; however, the Supreme Court has interpreted the APA's use of "the term 'burden of proof' to mean the burden of persuasion." *Dir., Off. of Workers' Comp. Programs, Dep't of Lab. v. Greenwich Collieries*, 512 U.S. 267, 276 (1994). "[T]he burden of persuasion [is] the notion that if the evidence is evenly balanced, the party that bears the burden of persuasion must lose." *Id.* at 272.

Under FORR, the shipper "bear[s] the burden of proof to demonstrate that (i) the defendant carrier has market dominance over the transportation to which the rate applies, and (ii) the challenged rate is unreasonable." 88 Fed. Reg. at 302 (citing, in part, 49 U.S.C. §§ 10701(d)(1), 10704(a)(1), 11704(b)). FORR, however, *does not* require the shipper to bear the burden of proof on the final offer. The Board argues that the "merits-stage 'full hearing' requirement is inapplicable at the remedy stage."

hearings." *Id.* (citing *Am. Trucking Ass'ns v. United States*, 344 U.S. 298, 318–20 (1953)).

As demonstrated *supra*, we conclude that § 554—and, as a result, § 556—apply to § 10701's "full hearing" requirement. As even the Board acknowledges, it has previously recognized that § 556(d) is the source of burden allocation in assessing maximum reasonable rates. *See, e.g.*, *Increased Rates on Coal, Midwestern Railroads*, Aug. 1979, 364 I.C.C. 29, 32 n.7 (1980) ("The Iowa utilities have the burden of proving that the rates they advocate are the maximum reasonable rates. *See* 5 U.S.C. [§] 556(d). 49 U.S.C. [§] 11701, moreover, does not contain a specific burden of proof for complaint proceedings. Therefore, the Administrative Procedure Act places the burden on the proponent of the order, in this case the utilities filing the complaint."); *Union Pac. R.R.—Pet. for Declaratory Ord.*, FD 35504, slip op. at 2 (STB served Oct. 10, 2014) (citing *N. Am. Freight Car Ass'n v. BNSF Ry., NOR* 42060 (Sub-No. 1), slip op. at 5 (STB served Jan. 26, 2007) (citing *Cities Service Oil Co. v. Soo Line R.R.*, 356 I.C.C. 838, 842 (1977) ("Complainant has the burden of establishing by competent evidence that the assailed [demurrage and storage charges] are unjust and unreasonable."))).

-19-

Respondents' Br. at 26. But, under the APA, as "the proponent of a rule or order," the shipper "has the burden of proof" on the selection of offers. 5 U.S.C. § 556(d). FORR is contrary to the APA because it does not require the shipper to carry the burden of persuasion on the final offer; in fact, the shipper need not prove anything. Under FORR, the Board is tasked only with "choos[ing] between the parties' final offers." 88 Fed. Reg. at 302.

Additionally, under FORR, contrary to the statutory language, it is the parties—not the Board—that "prescribe the maximum rate" pursuant to § 10704(a). Instead, the Board receives and reviews the parties' reasonableness analysis and final offers reflecting the maximum reasonable rate.[9] FORR then requires the Board to "choose between the parties' final offers. In making the rate reasonableness finding *and* choosing between the offers," the Board is to consider "the RTP [(rail transportation policy in 49 U.S.C. § 10101)], the Long-Cannon factors in 49 U.S.C. [§]10701(d)(2), and appropriate economic principles." 88 Fed. Reg. at 302 (emphasis added). But FORR strips the Board of its ability to modify the selected offer. *See id.* at 301 ("[T]he Board chooses one of those [final offer comparison] groups without modification.").

We conclude that this procedure falls short of the statutory requirement that "*the Board* . . . prescribe the maximum rate." 49 U.S.C. § 10704(a)(1) (emphasis added). Under FORR, the Board is limited in its "ability to exercise its own judgment by weighing each side's arguments, evaluating the evidence, and considering both the public interest and rail transportation policy." 88 Fed. Reg. at 316 (Schultz,

_____

[9]FORR acknowledges the "'likely' . . . overlap," 88 Fed. Reg. at 307, between the reasonableness inquiry and the Board's setting the maximum rate, *see* 49 U.S.C. § 10704(a)(1), which it refers to as the "maximum *reasonable* rate," 88 Fed. Reg. at 306 (emphasis added) ("[T]he maximum reasonable rate is the rate produced through the Board's rate reasonableness process . . . .").

dissenting). FORR effectively prevents the Board from giving "due consideration" to the statutory factors that the Board is required to consider in assessing a rate's reasonableness, *see* 49 U.S.C. § 10701(d)(2), by limiting the Board to the two final offers the parties propose in prescribing the maximum reasonable rate. *Cf. BNSF Ry. Co.*, 526 F.3d at 774 ("*[T]he Board* is the expert body Congress has designated to *weigh the many factors* at issue when assessing whether a rate is just and reasonable (emphasis added)). Despite the Board's representation that it "would take into account the criteria specified in . . . the [rail transportation policy], the Long-Cannon factors in 49 U.S.C. [§] 10701(d)(2), and appropriate economic principles," 88 Fed. Reg. at 302, the Board has no choice but to choose between these two offers "even if the Board finds the correct outcome falls above, below, or somewhere in between the two submissions, *id.* at 316 (Schultz, dissenting).

A hypothetical illustrates this point. Suppose a rail carrier is charging a rate of $100. Applying the statutory factors, the Board concludes that the rate is unreasonable. To make this finding of unreasonableness, the Board necessarily has to determine what the reasonable rate is, applying the Long-Cannon factors and relevant policy considerations. *See* 49 U.S.C. § 10701(d)(2). The Board, applying the relevant factors, would have concluded that $98 is a reasonable rate; thus, the rail carrier's rate of $100 is unreasonable. But under FORR, the Board must now choose between the parties' two final offers to prescribe the maximum reasonable rate. The rail carrier's final offer is $99. The shipper's final offer is $2. Under FORR, even if the Board independently concludes that the maximum reasonable rate was between $2 and $99, it would have no choice but to choose one of the parties' offers. Thus, it is one of the parties—not the Board—that prescribes the maximum rate, contrary to the plain language of the statute. *Id.* § 10704(a)(1) ("*[T]he Board* may prescribe the maximum rate . . . ." (emphasis added)).

By requiring "the Board" to "prescribe the maximum rate," § 10704(a)(1) rejects the notion that the Board is "to be a passive arbiter." *Pub. Serv. Co. of Colo. v. Burlington N. & Santa Fe Ry. Co.*, STB Docket No. 42057, 2005 WL 126476, at *3 (S.T.B. Jan. 19, 2005) (internal quotation marks omitted), *pet. for review denied sub nom. BNSF Ry. Co. v. Surface Transp. Bd.*, 453 F.3d 473 (D.C. Cir. 2006). The Board is not merely "to act as an umpire, calling balls and strikes for the adversaries appearing before [it]" when "considering a challenge to the reasonableness of a rate." *Id.* at *2. Instead, it must act as "the guardian of the general public interest, with a duty to see that this interest is at all times effectively protected." *Id.* at *3 (internal quotation marks omitted). The Board is

> not the prisoner of the party's submissions, but rather ha[s] the duty to "weigh alternatives and make its choice according to its judgment of how best to achieve and advance the goals of the National Transportation Policy." In other words, the [Board is] not expected to blandly call balls and strikes; rather, "the right of the public must receive active and affirmative protection at the hands of the Commission."

*Id.* (footnote omitted) (first quoting *Balt. & Ohio R.R. v. United States*, 386 U.S. 372, 429 (1967) (Brennan, J., concurring), then quoting *Harlem Valley Transp. Ass'n. v. ICC*, 500 F.2d 328, 335 (2d Cir. 1974)).

### III. *Conclusion*

Accordingly, we hold that the Board lacks statutory authority to prescribe rates through FORR, grant the petitions for review, and vacate the final rule.[10]

––––––––––––––––––––––––––––

[10]Because we hold that the Board lacks statutory authority to implement FORR, we need not address the petitioners' remaining arguments.