# United States Court of Appeals

### For the Eighth Circuit

_____

No. 25-1442

_____

General Electric Company

*Plaintiff - Appellee*

v.

Boilermaker-Blacksmith National Pension Trust

*Defendant - Appellant*

_____

Boilermaker-Blacksmith National Pension Trust; John T. Fultz, a fiduciary

*Plaintiffs - Appellants*

v.

General Electric Company

*Defendant - Appellee*

_____

National Coordinating Committee for Multiemployer Plans

*Amicus on Behalf of Appellant(s)*

Employer Associations

*Amicus on Behalf of Appellee(s)*

_____

Before GRUENDER, KELLY, and ERICKSON, Circuit Judges.
_____

KELLY, Circuit Judge.

Boilermaker-Blacksmith National Pension Trust (the Fund) sought withdrawal assessments under the Employment Retirement Income Security Act of 1974 (ERISA) from General Electric Company (GE), but an arbitrator found GE qualified for an exemption from withdrawal liability. The district court[1] upheld the arbitrator's decision, and the Fund appeals. We affirm.

I.

In 1974, Congress passed ERISA "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds have been accumulated in the plans." Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 720 (1984) (citing Nachman Corp. v. Pension Benefit Guar. Corp., 446 U.S. 359, 361–62, 374–75 (1980)). Title IV of ERISA "created a plan termination insurance program, administered by the Pension Benefit Guaranty Corporation (PBGC)" that "collects insurance premiums from covered pension plans and provides benefits to participants in those plans if their plan terminates with insufficient assets to support its guaranteed benefits." Id. (citing 29 U.S.C. §§ 1322, 1361).

_____

[1]The Honorable Brian C. Wimes, then United States District Judge for the Western District of Missouri, now Chief Judge.

Shortly after ERISA's passage, however, "Congress became concerned that a significant number of [multiemployer pension] plans were experiencing extreme financial hardship," which could in turn "forc[e] the PBGC to assume obligations in excess of its capacity." Id. at 721. At congressional direction, the PBGC studied the problem and found "that ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." Id. at 722. If one or more employers left the plan, the remaining employers would still be responsible for paying pension liabilities generated by the departed employers who were no longer participating in the plan. Connolly v. Pension Ben. Guar. Corp., 475 U.S. 211, 216 (1986) (citation omitted). Costs then increased for the remaining employers, providing an incentive for them to leave the plan, as well. See id.

Congress responded with the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 94 Stat. 1208 (codified as amended at 29 U.S.C. §§ 1381–1461). "[T]o protect the financial solvency of multiemployer pension plans," the MPPAA "requires most employers who withdraw from underfunded multiemployer pension plans to pay 'withdrawal liability.'" Bay Area Laundry & Dry Cleaning Pension Tr. Fund v. Febar Corp. of Cal., 522 U.S. 192, 196 (1997) (citations omitted). Withdrawal liability functions as "an exit price equal to [the employer's] pro rata share of the pension plan's funding shortfall," Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. CPC Logistics, Inc., 698 F.3d 346, 347 (7th Cir. 2012), and can be triggered by either a "complete withdrawal" or a "partial withdrawal," 29 U.S.C. § 1381(a). As relevant here, a partial withdrawal occurs when "there is a 70-percent contribution decline, or . . . a partial cessation of the employer's contribution obligation." Id. § 1385(a).

Congress also saw fit to include several exemptions to withdrawal liability within the MPPAA. One such exemption covers the "building and construction industry." Id. § 1383(b). In the building and construction industry, "work is generally on a project-by-project basis . . . and when a project ends an employer's workers will normally remain in the labor pool available for employment by other contributing

employers." Cent. States, Se. & Sw. Areas Pension Fund v. Robinson Cartage Co., 55 F.3d 1318, 1323 (7th Cir. 1995) (quoting Advance Notice of Proposed Rulemaking, 47 Fed. Reg. 42588 (Sept. 28, 1982)). For this reason, the withdrawal of an employer in this industry typically does not affect the viability of the plan.[2] The building and construction industry exception (BCI) applies—and thus exempts an employer from withdrawal liability—if "substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry[.]" 29 U.S.C. § 1383(b)(1)(A).

With this backdrop, we turn to the case at hand.

## II.

The Fund, a multiemployer pension plan that covers primarily employees in the building and construction industry, brought two partial withdrawal liability assessments against GE under the MPPAA.[3] The first assessment was based on the Fund's assertion that GE experienced a 70% decline in contribution base units

---

[2]The legislative record further explains:

> In the construction industry, the funding base of the plan is the construction projects in the area covered by the collective bargaining agreements through which the plan is maintained. An individual employee will typically work for tens or even hundreds of different employers over his or her working career, and the volume of work for a given employer will often fluctuate greatly from year to year. These normal events do not pose an undue threat to a plan as long as contributions are made for whatever work is done in the area.

Robinson Cartage, 55 F.3d at 1323 (quoting H.R. Rep. No. 96-869, pt.1, at 75 (1980)).

[3]The parties agree that the plan at issue "primarily covers employees in the building and construction industry[.]" 29 U.S.C. § 1383(b)(1)(B)(i).

(CBUs)[4] in three consecutive years when compared to the average of the two highest years in the preceding five-year period. See 29 U.S.C. § 1385(b)(1). According to the Fund, this partial withdrawal meant GE owed approximately $205 million in withdrawal liability. The parties refer to this claim as the 70% Decline Claim. See 29 U.S.C. § 1385(b)(1)(A). The second assessment, for an additional $22 million, was a "bargaining-out" partial withdrawal based on GE's closure of a manufacturing facility in Chattanooga, Tennessee (Chattanooga Claim). See 29 U.S.C. § 1385(b)(2)(A)(i).

GE disputed the Fund's assessments, asserting it qualified for the BCI, and initiated arbitration proceedings under 29 U.S.C. § 1401(a). The arbitrator ruled for GE, finding that GE qualified for the BCI and, thus, was relieved of any withdrawal liability as to either claim. The parties each sought review in the district court under § 1401(b)(2) and agreed to consolidate the two claims. The district court found the language of the BCI ambiguous, adopted GE's proposed headcount method, and affirmed the arbitrator's ruling. The Fund appeals.

III.

A.

The Fund asserts that GE does not qualify for the BCI because less than "substantially all" its employees at GE's three relevant entities—APCom Power, Alstom Power, Inc., and Atlantic Plant Maintenance—work in the building and construction industry. See 29 U.S.C. § 1383(b)(1)(A). The issue on appeal is narrow:

_____

[4]A CBU is "a unit with respect to which an employer has an obligation to contribute under a multiemployer plan[.]" 29 U.S.C. § 1301(a)(11). Here, CBUs are employee hours.

how do we count GE's employees to determine if "substantially all"[5] of them worked in the building and construction industry for purposes of the BCI? More specifically, is "substantially all" determined by using a monthly headcount or a cumulative headcount? The parties agree that the answer to this question resolves both the 70% Decline Claim and the Chattanooga Claim.

All of GE's employees at APCom Power, Alstom Power, Inc., and Atlantic Plant Maintenance are boilermakers, but they are divided into two types: field workers and shop workers. Only the field workers—those responsible for repairing and constructing customers' boilers—"perform work in the building and construction industry" under § 1383(b)(1)(A). Shop workers, who manufacture the boiler components, do not.[6] On average, the tenure of a field worker is also dramatically shorter than the tenure of a shop worker. After a boiler is constructed or repaired, field workers generally return to the union hall to await their next project with a new employer. In contrast, shop workers are more likely to work consistently for the same employer over a longer period of time.

The dispute centers on the method by which to determine whether "substantially all" GE's employees at its three entities worked in the building and construction industry during the eight-year lookback period relevant to the Fund's claims.[7] The parties have presented only two options: a monthly headcount method (favored by the Fund), and a cumulative headcount method (favored by GE). Under

---

[5]The parties have stipulated—and courts have generally found—that "substantially all" means 85% of covered workers. See, e.g., Medina v. Cath. Health Initiatives, 877 F.3d 1213, 1228 (10th Cir. 2017).

[6]Employees "who manufacture construction materials that are installed by others at the construction site are not in the building and construction industry." See Union Asphalts & Roadoils, Inc. v. MO-KAN Teamsters Pension Fund, 857 F.2d 1230, 1234 (8th Cir. 1988).

[7]The parties stipulated to the lookback period for each claim.

the monthly headcount method, a "snapshot" is taken each month of the number of field workers and shop workers employed. If, in most months, field workers make up more than 85% of the total workers (calculated on a month-by-month basis), GE qualifies for the BCI. Under the cumulative headcount method, all field workers and shop workers who were employed by GE during the lookback period are added up—essentially a "snapshot" of the entire length of the lookback period. If field workers account for more than 85% of that total, GE qualifies for the BCI. On the stipulated record here, the parties agree: under the monthly headcount method, GE does not qualify for the exemption, but under the cumulative headcount method, it does.

B.

The MPPAA allows parties to bring an action in federal court to "enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2). We review "a district court's grant of summary judgment *de novo*[.]" Wolterman v. Syverson, 164 F.4th 1086, 1090 (8th Cir. 2026) (citing De Mian v. City of St. Louis, 86 F.4th 1179, 1182 (8th Cir. 2023)). Under the MPPAA, courts "must accept the arbitrator's findings of fact as correct unless rebutted by a clear preponderance of the evidence," but review an arbitrator's legal conclusions de novo. Union Asphalts & Roadoils, 857 F.2d at 1233.

"When interpreting a statute, we begin with the statute's plain language, giving words the meaning that proper grammar and usage would assign them." Union Pac. R.R. Co. v. Surface Transp. Bd., 113 F.4th 823, 833 (8th Cir. 2024) (quoting United States v. Lester, 92 F.4th 740, 742 (8th Cir. 2024)). Here, the statute exempts an employer from withdrawal liability if "substantially all the employees with respect to whom the employer has an obligation to contribute under the plan perform work in the building and construction industry[.]" 29 U.S.C. § 1383(b)(1)(A). But the statute is silent on how to count employees for purposes of determining whether "substantially all" of them work in the industry. There are

multiple ways to count employees that would not contradict the statute.[8] And a "statutory provision is ambiguous if it is susceptible to more than one reasonable interpretation." LaCurtis v. Express Med. Transporters, Inc., 856 F.3d 571, 578 (8th Cir. 2017) (citation modified) (quoting Owner–Operator Indep. Drivers Ass'n v. Supervalu, Inc., 651 F.3d 857, 862 (8th Cir. 2011)). Because it is susceptible to multiple interpretations on the question before us, § 1383(b)(1)(A) is ambiguous.

Given this ambiguity, we must "independently interpret the statute." Union Pacific, 113 F.4th at 833 (quoting Loper Bright Enters. v. Raimondo, 603 U.S. 369, 400 (2024)). "We must 'use every tool at [our] disposal to determine the best reading of the statute and resolve [any] ambiguity." Id. (alterations in original) (quoting Loper Bright, 603 U.S. at 400). "When a statute is ambiguous, a court 'seek[s] guidance in the statutory structure, relevant legislative history, congressional purposes expressed [in the statute at issue], and general principles [of law relevant to the statute at issue]." United States v. E.T.H., 833 F.3d 931, 937 (8th Cir. 2016) (alterations in original) (quoting Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 737 (1985)).

The congressional record does not tell us the proper method for counting employees, but it does provide guidance to inform our reading of the statute. For example, Congress recognized certain attributes of the building and construction industry. First, "work is generally tied to the area and not to a particular employer, so . . . an employer's ceasing work in the area normally does not remove jobs from the plan's contribution base." S. Comm. on Labor and Hum. Res., 96th Cong., S. 1076, the Multiemployer Pension Plan Amendments Act of 1980: Summary and

---

[8]Both the arbitrator and the district court identified several possible methods for counting employees for purposes of the BCI, none of which was inconsistent with the statute. Indeed, the arbitrator concluded that "an hourly headcount would better advance the Fund's theory" but explained that the Fund did not advance this standard before the arbitrator. We, too, have no occasion to address this, or any other, method for counting employees, other than the two the parties present here.

Analysis of Consideration 2 (Comm. Print 1980). Second, Congress expressly considered the "mobility of both employers and employe[e]s and the intermittent nature of employment" in the building and construction industry in crafting the exemption. Id. at 13. The exemption thus reflects the idea that "the frequent fluctuation in contributions by construction employers" that results from the fluctuating nature of construction employment "does not cause problems for [a multiemployer plan]." Robinson Cartage, 55 F.3d at 1323.

Neither the monthly headcount method nor the cumulative headcount method is a precise fit for determining eligibility for the BCI. Nevertheless, we conclude that, of the two options, the cumulative headcount method is more consistent with the purpose of the statute and hews more closely to congressional intent. Again, the goal of the MPPAA is to protect the solvency of multiemployer plans. Congress fashioned the BCI to take into account specific attributes of the building and construction industry—namely that an employee who stops working for a building and construction employer will likely find work with another employer in the same region. The arbitrator found that GE "clearly and consistently engaged in the construction industry" and "did not operate in the fashion of … the employer in Robinson Cartage:" Unlike the Robinson Cartage employer, GE did not "deviate from [its] substantial construction operations" during the lookback period relevant here.[9]

Given the arbitrator's factual finding that GE did not exit the building and construction industry during the lookback period, the cumulative headcount method is better able to accommodate natural fluctuations inherent in building and construction employment than the monthly headcount method advanced by the Fund. See 29 U.S.C. § 1401(c) ("In any [court] proceeding [subsequent to an arbitral award], "there shall be a presumption, rebuttable only by a clear preponderance of the evidence, that the findings of fact made by the arbitrator were correct."). The

---

[9]The Fund has taken the position that its Chattanooga Claim rises and falls with its 70% Decline Claim. As a result, we need not separately address the Chattanooga Claim.

Fund's monthly headcount method is linked to, and largely a creature of, the parties' CBA. Under the Fund's reading, the parties' existing course of business should guide the choice of headcount for purposes of determining whether "substantially all" employees work in the building and construction industry. Here, that choice is monthly, because the CBA requires GE to make contributions to the fund on a monthly basis. The Fund supports this approach in part by relying on the present tense of the statute: "substantially all the employees with respect to whom the employer *has* an obligation to contribute under plan." 29 U.S.C. § 1383(b)(1)(A) (emphasis added). But the employer has an obligation to contribute for all hours the relevant employees work, and the parties' decision to schedule monthly contributions—even if a commonly agreed upon schedule—does not alter that obligation.

A different set of facts may warrant a different result. See, e.g., Robinson Cartage at 1323 ("It therefore does not violate congressional intent to hold Robinson liable for partial withdrawal" where the reason for the company's decline in contributions to the fund was not the "expected fluctuations of construction work" but rather its departure from the steel hauling business, which was not covered by the BCI.). In another context, another method for counting employees to determine eligibility for the BCI might better align with the language and goals of MPPAA. We also see no obstacle to a fund and an employer contractually agreeing on what method to use to determine whether "substantially all" employees worked in the building and construction industry. See, e.g., id. at 1321 (parties agreed to use CBUs, rather than headcount, to determine if "substantially all" of the relevant employees performed work in the building and construction industry). But here, of the two options presented, GE's preferred method is less arbitrary and more faithful to the statute and the congressional intent behind it.

IV.

We affirm.

_____

-10-